# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| LAWRENCE CURLETT and | ) |
| STEPHEN DUPHILY, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civ. No. 11-718-SLR |
| | ) |
| MADISON INDUSTRIAL SERVICES | ) |
| TEAM, LTD. and J.V. INDUSTRIAL | ) |
| COMPANIES, LIMITED | ) |
| PARTNERSHIP, | ) |
| | ) |
| Defendants. | ) |

Jeffrey K. Martin, Esquire of Martin & Associates, P.A., Wilmington, Delaware. Counsel for Plaintiffs.

Rick S. Miller, Esquire of Ferry, Joseph & Pearce, P.A., Wilmington, Delaware. Keith B. Sieczkowski, Esquire of Branscomb, P.C., Corpus Christi, Texas. Counsel for Defendants.

## MEMORANDUM OPINION

Dated: May 31, 2012
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On August 16, 2011, plaintiffs Lawrence Curlett ("Curlett") and Stephen Duphily ("Duphily") filed the present complaint against defendants Madison Industrial Services Team, Ltd. ("Madison") and J.V. Industrial Companies ("JVIC") alleging unjust termination in violation of the Delaware Whistleblowers' Protection Act, 19 Del. C. § 1703 ("the Act"). Duphily also seeks to recover against defendants on conversion and unjust enrichment claims. The court has subject matter jurisdiction over the present action under 28 U.S.C. § 1332(a). Presently before the court is the defendants' motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, the court grants defendants' motion as it pertains to the Act and all claims against JVIC and reserves judgment as to the conversion and unjust enrichment claims pending determination of jurisdiction.

## II. BACKGROUND[1]

Beginning in 2005, Curlett, a Delaware resident, and Duphily, a Maryland resident, were employed by Madison, a Texas limited partnership, out of its Upland, Pennsylvania office. (D.I. 1 at ¶¶ 6-7, D.I. 6 at 8 ¶ 9) Duphily was working his way up to higher positions at Madison and was eager to be seen as a "team player." (D.I. 1 at ¶ 8, 10) In the spring of 2006, Duphily allowed Madison to use some of his own scaffolding equipment on a job at the McKee Run Electric Generating Station in Dover, Delaware ("McKee Run job"). (*Id.* at ¶ 11) Tony Bleyer ("Bleyer"), a sales manager for

---

[1] The facts as laid out have been adopted from plaintiffs' complaint. Any ambiguities or inconsistencies arising in this opinion derive from similar ambiguities and inconsistencies found in the complaint.

Madison, expressed his appreciation for Duphily's contributions to the profitability of the McKee Run job. Duphily eventually moved into a sales position under Bleyer. (*Id.* at ¶ 14)

Following his promotion, Duphily offered to allow Madison to continue to use his scaffolding as long as his employment continued. (*Id.* at ¶ 15) To better facilitate the use of his scaffolding, Duphily moved all of his equipment to a convenient location in New Jersey sometime around the summer of 2006. (*Id.* at ¶¶ 16-17) At approximately the same time, a power struggle ensued within Madison, which resulted in James Dougherty, Sr. ("Dougherty") becoming one of the most influential people within Madison. (*Id.* at ¶ 18) Due to concerns for the safety of his equipment after the power struggle, Duphily moved his equipment from New Jersey to Madison's location in Chester, Pennsylvania. (*Id.* at ¶ 20)

In late summer of 2007, Madison used approximately 200 pieces of Duphily's scaffolding for a job in Philadelphia. (*Id.* at ¶ 22) Later that year, Duphily noticed that more of his scaffolding was missing. Duphily was told by Victor Padavani ("Padavani"), one of the foremen on the Philadelphia job, that Padavani had been taking the scaffolding to use on the Philadelphia job. (*Id.* at ¶ 23)

Near this same time, Padavani and a handful of other Madison employees formed a business called Delaware County Scaffolding Services ("DCS").[2] (*Id.* at ¶¶ 24-25) DCS was created to rent scaffolding to Madison and perhaps other companies. (*Id.* at ¶ 26) When Duphily was approached about joining DCS, he refused as he

_____

[2]Duphily and Curlett believe that DCS was formed in late 2007 or early 2008. (D.I. 1 at ¶ 24)

thought it unethical for Madison employees to create an entity that was a vendor to Madison. (*Id.* at ¶ 28) DCS took some of Duphily's scaffolding without his knowledge or consent and used it in its business. (*Id.* at ¶ 29)

Duphily was asked in March 2008 to review some DCS invoices. (*Id.* at ¶ 31) It was at this point that Duphily became aware that DCS was charging Madison double the market rate for scaffolding. (*Id.* at ¶ 32) Duphily showed the invoices to Curlett who agreed that it was inappropriate for a group of Madison employees to act as a vendor to Madison. (*Id.* at ¶ 33) Curlett also thought it was improper for DCS to use Duphily's scaffolding and charge excessive rates that Madison then passed on to its own clients.[3] (*Id.* at ¶ 35) Curlett reported his concerns to Walt Waryga ("Waryga"), vice-president of Madison. (*Id.* at ¶ 37)

Waryga agreed with Duphily and Curlett that DCS's relationship with Madison was improper and he took steps to end it. (*Id.* at ¶ 40) In May of 2008, Waryga held a meeting with Dougherty, Curlett, and others stating that Madison would no longer do business with DCS and that Duphily should not be identified as the whistleblower. (*Id.* at ¶ 41) Although he denied it at the meeting, it appears that Dougherty knew about DCS and that his son was in line to become a member. (*Id.* at ¶ 42) The complaint suggests that Madison and its parent company, JVIC, tolerated Dougherty's wrongful activities because he generated a substantial amount of profit for the companies.[4] (*Id.*

---

[3]This is the first indication in the complaint that anyone outside DCS was aware that DCS was using Duphily's equipment. There is no indication of when Duphily found out or any actions that he may have taken to stop DCS from using his equipment.

[4]The complaint does not specify what any of these wrongful actions were, other than Dougherty's knowledge of DCS which plaintiffs characterize as fraud and

3

at ¶ 43) Dougherty, Bleyer, and Robert Hooper ("Hooper") are all identified as individuals at Madison who protected the wrongful practices of DCS. (*Id.* at ¶ 45)

Shortly after exposing DCS, Duphily was told by co-workers that Madison management, particularly Dougherty, was not happy that he had exposed DCS and wanted to fire him. (*Id.* at ¶ 47) At some point in the spring of 2008, Duphily also received what he thought were hostile emails from Dougherty. (*Id.* at ¶ 46) When Duphily asked Dougherty about one of the emails, Dougherty responded that it had been poorly worded and that Duphily had "taken it the wrong way." (*Id.*) Duphily was re-assigned to work under Dougherty and, at this time, he found out that his identity as a whistleblower was no longer confidential. (*Id.* at ¶¶ 48-49)

Duphily then began working under Mike Miller ("Miller"), who was an employee of JVIC. (*Id.* at ¶ 50) Although Duphily was supposedly working for Miller, Dougherty tried to intervene and have Duphily laid off. (*Id.* at ¶ 51) It appears that, even though Miller was in some type of position over Duphily, he was not Duphily's direct supervisor. During this period, Dougherty still had control over Duphily's assignments and his pay.[5] Duphily and Dougherty continued to have conflicts throughout this period. In late 2009 or early 2010, while working with Duphily, Miller told him that he was sick of the confrontations between Duphily and Dougherty and that Duphily should just go along

racketeering.

[5]"[Dougherty] told [Duphily] that he should ship his scaffolding equipment to the Sunoco facility at Marcus Hook, Pennsylvania, where Duphily would be running a maintenance project." (D.I. 1 at ¶ 53) "While Duphily's pay went up to the foreman scale . . . it should have been [g]eneral [f]oreman scale . . . but Miller told him that [Dougherty] had refused to authorize this." (D.I. 1 at ¶ 56)

4

with whatever Dougherty said. (*Id.* at ¶ 55)

In late February of 2010, while Duphily was working on a job in Marcus Hook, Pennsylvania, his supervisor, Jim Thompson ("Thompson"), tried to coerce Duphily to sign some papers to support the recent layoff of an African-American foreman, Al Dodson. (*Id.* at ¶¶ 53, 57) Duphily refused to sign the papers, resulting in the reversal of the layoff.[6] (*Id.*) However, a new foreman, loyal to Dougherty, was hired anyway. (*Id.* at ¶ 58) Duphily reported Thompson's coercion to Robert Waryga in Madison's human resources department and was told that he might have grounds to sue if Thompson or Madison retaliated. (*Id.* at ¶ 59)

After working for some period as general foreman, but only being paid as a foreman, Duphily asked for an increase in his compensation. (*Id.* at ¶ 60) Shortly thereafter, his company truck and company credit cards were taken from him. (*Id.*) After working as general foreman at the foreman rate for six weeks, Duphily's compensation was increased on roughly February 27, 2010. (*Id.* at ¶ 61) Less than two months later, on April 19, 2010, Duphily lost access to his computer and his email archive. (*Id.* at ¶ 62) On April 22, 2010, Duphily was told that his pay would revert to the foreman rate. (*Id.* at ¶ 63) When Duphily refused to have his pay lowered, he was laid off. (*Id.*)

After being laid off, Duphily attempted to retrieve his scaffolding equipment. (*Id.* at ¶ 64) Duphily states that Dougherty delayed its return. (*Id.*) Madison even went so far as to bill the client on the McKee Run job for dismantling Duphily's equipment so

---

[6]The complaint does not state whether Dodson was laid off and re-hired at the same or different wage or position, or if his layoff was never finalized.

that it could be returned to him even though Duphily had to take it down himself.[7] (*Id.* at ¶ 65) Duphily further claims that Madison has thus far refused to return over $30,000 worth of equipment to him.[8] (*Id.* at ¶ 66)

In October of 2010, Madison eliminated Curlett's position as business manager and he took a lower position as lead field accountant. (*Id.* at ¶ 68) Curlett, at some point, had been told that Madison's management wanted to fire him for his involvement in the DCS affair.[9] (*Id.*) At the time of Curlett's demotion, Dougherty demanded that he turn over the DCS accounting file. (*Id.* at ¶ 69) On June 7, 2011, Curlett was laid off from his position as lead field accountant. (*Id.* at ¶ 70)

## III. STANDARD OF REVIEW

In reviewing a motion filed under Federal Rule of Civil Procedure 12(b)(6), the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiffs. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2002). A court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384-85

---

[7]This is apparently the basis for Duphily's unjust enrichment claim.

[8]This is the basis for Duphily's conversion claim.

[9]There is no discussion in the complaint of Curlett's employment conditions at, or any retaliation by, Madison between the May 2008 meeting when Waryga determined to end the relationship with DCS and the elimination of Curlett's position in October 2010 other than a statement that he had been told he had a "bulls-eye" on his back following the DCS affair.

6

n.2 (3d Cir. 1994). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (interpreting Fed. R. Civ. P. 8(a)) (internal quotations omitted). A complaint does not need detailed factual allegations; however, "a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 545 (alteration in original) (citation omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* Furthermore, "[w]hen there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1950 (2009). Such a determination is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Id.*

## IV. DISCUSSION

### A. Claims Brought Under the Act

The legislative history of the Act demonstrates that it has no application to actions taken by foreign employers in relation to workers employed outside of Delaware. The Act has its roots in 29 Del. C. § 5115, which provides some protection for public employees who report violations of law to elected officials.[10] In 2004, the

---

[10]Specifically, 29 Del. C. § 5115 states in relevant part: "No public employee shall be discharged, threatened or otherwise discriminated against with respect to the terms or conditions of employment because that public employee reported, in a written or oral communication to an elected official, a violation or suspected violation of a law

7

Delaware General Assembly passed the Act to extend a similar protection to other employees. The synopsis to Senate Bill 173, which contains the Act, states: "This Act extends whistleblower protection to all employees in the State. Currently only public employees communicating to elected officials are so protected." SB 173, 142nd Gen. Assemb., Reg. Sess. (Del. 2004). As the Act was based on another law, it is appropriate for Delaware courts to look to the original statute for guidance. *State v. Ismaaeel*, 840 A.2d 644, 648 (Del. Super. 2004). Since the Act grew out of a separate statute designed to protect public employees, without clear direction from the legislature, it follows that the Act would not apply to actions of foreign employers taken outside the State of Delaware.

This conclusion is consistent with the language - "employees **in** the State" - contained in the synopsis of the Act. (Emphasis added) Such restrictive language is a clear indication that the legislature did not intend to provide protection to any class other than individuals employed in the State of Delaware.[11] Here, plaintiffs were employed out of Madison's Upland, Pennsylvania office and there is no indication in the pleadings that any of the complained of conduct occurred in Delaware. Given the legislative history of the Act, indicating that the Act was intended to govern interactions between employers and employees that take place within the State of Delaware, there is no reason to apply the Act under the instant circumstances.

_____

or regulation promulgated under the law of the United States, this State, its school districts, or a county or municipality of this State unless the employee knows that the report is false."

[11]The court recognizes that plaintiff Curlett is a Delaware resident; nevertheless, the Act is directed to **employees** in the State, not residents of the State.

8

## B. Liability of JVIC[12]

The claims against JVIC should be dismissed for several reasons. First, the text of § 1703 applies only to employers.[13] Specifically, § 1703 prohibits employers from terminating employees in retaliation for certain whistleblowing activities. Plaintiffs state in the complaint that "at relevant times [they were] employed by Madison." (D.I. 1 at ¶¶ 1-2) The complaint contains no information that either plaintiff was at any time employed by, let alone terminated by, JVIC.[14] Further, there is no indication that JVIC meets the definition of "employer" contained in the statute as the complaint does not show that Duphily or Curlett ever performed any services for wages for JVIC.[15] Thus,

_____

[12]The above discussion of the Act applies to JVIC and Madison, whereas this section applies to all claims against JVIC only.

[13]The Act provides in relevant part that "[a]n employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment . . . [b]ecause the employee reports verbally or in writing to the employer or to the employee's supervisor a violation, which the employee knows or reasonably believes has occurred or is about to occur, unless the employee knows or has reason to know that the report is false." 19 Del. C. § 1703. "Violation" is defined in relevant part as "an act or omission by an employer, or an agent thereof, that is . . . [m]aterially inconsistent with, and a serious deviation from, financial management or accounting standards implemented pursuant to a rule or regulation promulgated by the employer or a law, rule, or regulation promulgated under the laws of this state, a political subdivision of this state, or the United States, to protect any person from fraud, deceit, or misappropriation of public or private funds or assets under the control of the employer." 19 Del. C. § 1702(6)(b).

[14]With regard to Duphily, the complaint states that "he was laid off on Monday, April 22, 2010." (D.I. 1 at ¶ 63) With regard to Curlett, the complaint states that "[o]n or about June 7, 2011, [Curlett] was told that he had been 'laid off' as [l]ead [f]ield [a]ccountant." (D.I. 1 at ¶ 70)

[15]"'Employer' means any person, partnership, association, sole proprietorship, corporation or other business entity, including any department, agency, commission, committee, board, council, bureau, or authority or any subdivision of them in state,

9

by the plain language of the statute, JVIC should not be a defendant in the present suit.

Mere ownership of a business does not establish the liability of a parent company for the actions of its subsidiary. The Delaware Court of Chancery held in *Albert v. Alex. Brown Management Services, Inc.*, Civ.A. 762-N, Civ.A. 763-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005), that close relationships, even to the point where the subsidiary's management is run by the parent's employees, are not sufficient to hold the parent liable for the subsidiary's actions unless the "subsidiary is in fact a mere instrumentality or alter ego of its parent." *Id.* at *9. As the complaint does not allege, nor does it even contain any facts to suggest, that Madison is an instrumentality or alter ego of JVIC, there is no authority to support the proposition that JVIC should be exposed to liability simply because it owns Madison.

Neither does the complaint assign any allegations of wrongdoing, in relation to § 1703, to either of the two JVIC employees mentioned by name. For a time, Duphily worked under Miller, a JVIC employee.[16] The complaint, however, does not state that Miller was Duphily's supervisor, nor does it appear that he acted as such. The only action Miller took, according to the complaint, was to tell Duphily to go along with what Dougherty told him to do. In fact, even while working with Miller, Duphily's pay and work assignments were still controlled by Dougherty. Since Miller did not have any

---

county or municipal government. One shall employ another if services are performed for wages or under any contract of hire, written or oral, express or implied." 19 Del. C. § 1702(2).

[16]At no point does the complaint establish any connection between Curlett and any JVIC employees.

10

apparent supervisory control over Duphily, it would be inappropriate to base JVIC's liability on the fact that Duphily worked under him to some unexplained extent.

The other JVIC employee discussed in the complaint, Hooper, likewise does not give rise to liability on JVIC's part. As a threshold matter, there is some inconsistency in the complaint as to whether Hooper even works for JVIC. At one point, Hooper is included as one of the people at Madison who protected the wrongful actions of DCS. (D.I. 1 at ¶ 45) At later points, Hooper is described simultaneously as upper management of Madison and an employee of JVIC.[17] (D.I. 1 at ¶¶ 72, 76) At no point, however, is Hooper alleged to have done any more than to know about DCS's activities. Plaintiffs do not suggest that he took part in any activity proscribed under the Act, therefore, it would be inappropriate to base JVIC's liability on any involvement that Hooper may have had in any of the actions complained of by plaintiffs.

## V. CONCLUSION

For the foregoing reasons, the court shall grant defendants' motion to dismiss as it relates to claims under the Act and all claims against JVIC. Because of the dismissal of these claims, the court has some concerns as to whether it will have jurisdiction over the conversion and unjust enrichment claims against Madison as they may fail to meet the amount in controversy requirement of 28 U.S.C. § 1332. Judgment on the dismissal of the conversion and unjust enrichment claims is reserved until the issue of the amount in controversy is resolved. The parties are instructed to file letter

---

[17]"The information provided by [Duphily] to the upper management of Madison (including information reviewed by Hooper at [JVIC]) as described . . ." (D.I. 1 at ¶¶ 72, 76)

11

memoranda within thirty days, no longer than three pages, on why jurisdiction is, or is not, appropriate in light of this opinion.